Good morning, Your Honor. May it please the court. My name is Veronica Proctor. I represent Plaintiff and Appellate Ross Mickelson. I would respectfully like to reserve three minutes for rebuttal today. At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter. Rather, it's to determine whether there's a genuine issue for trial. Credibility determinations, weighing the evidence, and the drawing of legitimate inferences from the facts are the jury's function. Here, the District Court erred when it resolved disputed factual issues, some of which required an assessment of witness credibility. In dismissing Mr. Mickelson's claims, and I'm going to generalize this, the District Court essentially found that Cummins had good cause to terminate Mr. Mickelson because of longstanding inadequate communication. It was a serious and long-term problem. Insubordination is what they said? Yes. You said they're disputed factual issues. Why don't we cut to the chase and you tell me what issues were disputed and the District Court was in error in finding them? Sure, Judge Bea. Well, the long-term, serious, inadequate communication was an error in Mr. Mickelson's view because the termination notice just alleged insubordination for failure for 8 a.m. daily check-in calls March through April. It did not reference the November 2014 or any other previous months of communication issues that the District Court used when it relied in its decision. Why would March through April be insufficient? Your Honor, that's a good question and that's essentially why we have a lot of disputed facts here today. Mr. Mickelson injured his shoulder, as this Court is well aware, in November of 2014. He continued to have issues with chronic pain. He had cortisone injections and physical therapy appointments, etc. However, he was still struggling, essentially. So in March, March 2, 2015, he was prescribed a strong opioid medication, Tramadol, to help with his fatigue, since he wasn't sleeping at night, and his chronic shoulder pain. Unfortunately, that started the chain of events that is why we're here today. The next 60 days, he struggled under the influence of this medication. In his affidavit, he specifically stated that the Tramadol made him drowsy, affected his balance, caused stomach issues. He was not able to drive per Cummins' policy because he was under the influence of a narcotic. Did he ever say he was unable to pick up the phone and call Mr. Colby? It did not. All right. And he was communicating with Mr. Colby by email? He was, sometimes. And he was supposed to communicate daily, and he didn't. Isn't that right? And our argument to that is that March 3rd through, I believe, the 11th, he was sick or at home because of the side effects of the narcotic. He checked in every one of those days via email with Mr. Colby, one of those days he called. Okay, my timeline shows that between March 4 through 6, he did not contact Mr. Colby. Is that wrong? Your Honor, I'd have to refer to my timeline. He was in contact with the human resources gal, excuse me, Mrs. Nino, and he had a doctor's note for those days that he was out, March 3rd through the 6th. Okay. On March 7th, Nino instructed him to call Colby on March 10th. On March 8th, Mickelson emails Nino saying he didn't know he needed to request PTO. March 9th, Nino emails Mickelson telling him to come to work on March 10th, and he must call, all capital letters, must call Colby when he arrives. Right. That's correct, Your Honor. However, he didn't end up coming to work on March 10th. He went to physical therapy on March 10th, right? He went to physical therapy, and throughout the next week, he continues to have issues with PT, medication side effects, and asks for a non-paid leave of absence so he can direct his full attention to his medical issues and then come back to work. Okay, but even on, so on March 10th, I'm focusing on this part of the timeline because it's what you raised. On March 10th, the previous day, March 9th, must call tomorrow, in all capital letters. Then on March 10th, he didn't call. Mickelson emails Colby that he's a physical therapy appointment in the morning. The following morning, I understand that I'm supposed to call every day at 8 a.m. March 11th. He didn't call. He emailed at 10 o'clock that night, I believe. Did I, am I missing something? No, Your Honor, you're not. Mr. Mickelson's argument is that it was reasonable that he didn't think he needed to do his 8 a.m. check-ins if he was taking a sick day or PTO leave. That those 8 a.m. check-ins were for when he was actively working since they were supposed to be with a supervisor to discuss the plan for the day. So he interpreted his duty to his superior to be, I don't have to call you even though you asked me to call you if I'm taking a sick day. Correct. Is there some basis for that? Yes, Your Honor. He wasn't, if he wasn't... Some basis in an employer manual, employee manual, or any law that you can tell me about that the employee can interpret when he has to call and answer to his supervisor, giving him an instruction? No, Your Honor, but... Pardon me, was he getting paid during this time? Yes. That's, well, he's on commission, so that's a little bit of a complicated question, Your Honor. But when he was sick or on PTO, he did not realize that he needed to call... Was he so sick that he couldn't pick up the phone and call Colby? Well, he was emailing Colby and human resources. That answers the question, doesn't it? He can handle his fingers on a typing board, but he can't pick up the phone and call Colby? Well, I think his actions on March 17th suggest the reason he was reticent to call Colby. He, at that point, filed an internal grievance with the company saying that he feared retaliation from Colby or false accusations and that he was being discriminated against because of his disability and request for accommodation with his shoulder injury. And that investigation was carried out by the company and found to be insubstantial? Correct. The problem with that, Your Honor, is that through March 17th through April 14th, that was the timeline of the internal investigation. There are some facts on the record that suggest the investigation was merely, I don't want to say a sham, but essentially had some issues with its transparency and its purpose. I say that because the human resources gal emailed Colby privately shortly after the told him that it was going to be fine. This was no big deal and that she wasn't concerned about it. He wrote back and told her it was his second complaint against him in two months and did a smiley face about how it probably wouldn't be his last. A few days after that, the internal investigator that Cummins had assigned to carry out the investigation, she was from a different office. Before even interviewing Mr. Michelson, she calls Taryn Nenow, the human resources gal, and says to her, so what's this $1.5 million project that he's close to finishing? I'm concerned about it from a commission point of view because we don't want, if he's terminated, we certainly don't want that to fuel the fire of a retaliation claim. And forgive me, I'm interviewing Mr. Michelson, the human resources gal is going around to the supervisor making smiley face emojis and telling him that this investigation is no big deal and he'll be fine. And they haven't even spoken to Michelson. Since they speak to Michelson, actually, I apologize, prior to speaking to Michelson, they pull all his emails, his phone calls, and his annual reviews. The crux of his complaint against Cummins was disability discrimination, failure to accommodate, and retaliation for his shoulder claims. So how his annual reviews, emails, or phone calls relate to that, I don't think that they do. But of course, that's a jury question. Was Cummins, in good faith, actually carrying out this internal investigation? Or was the outcome predetermined and they were merely going through the steps? The internal investigator never even pulled Colby's annual reviews or the fact that he had been implicated in past... The problem you have, maybe you have, there were specific instructions given to an employee who admittedly worked commissions. He knew that once upon a time, his productivity was very high. He thought he made the money that made the company operate. So when they changed personnel, he had his... This record would suggest he had made up his mind about what his position ought to be and what he should be able to do. But we can't decide the case on that. We've got to decide the case on what the record shows. What the record shows is he was told to do certain things that he deliberately failed to do. Now, is that a fair summary? Insubordination can be good cause, of course, Your Honor. But Montana law specifically states that a violation of an employer's policy in the summary judgment stage is insufficient to create an absence of material fact. No, it wasn't the policy that he... There's no material fact that he didn't communicate. Correct. But that fact alone does not mean that there's not a disputed fact for the jury to consider. For instance, going by the tenor of this panel so far, let's just assume that insubordination was good cause. He can still pretext. For instance, there was no 8 a.m. check-in call ever prior to the beginning of the issues he was having with the medication. He had had an annual... Where's his evidence that other people were told they had to report and didn't do so and they weren't fired? That's what pretext would be. Right. The 8 a.m. call-in deadline was only for Mr. Michelson. It was the week prior didn't have any call-in mandate. It didn't have any call-in mandate the year prior. He was not put on a performance improvement plan or anything of that nature. The 8 a.m. call-in was only instituted after he got sick and he was having trouble communicating and he wasn't even hardly at work. When did he first get sick? He injured his shoulder in November of 2014. Right. Up until then, he didn't have... Well, okay. It looks like they were accommodating his schedule for physical therapy appointments. Okay. Here we go. He reported his workers comp injury on November... Oh, we don't have an exact date. We have at ER 233, but it's November. I believe it was November 11th, Your Honor. But November 11th is the date where he met with Colby and they said, you have to give daily check-in communication. And Michelson told Colby... Am I pronouncing your client's name correctly? Michelson? Michelson, correct. Michelson told Colby that he fell in the stairs at work. It says date unknown, but that's when he told Colby. Is that what you're referring to? Correct, Your Honor. And then he reported it. Right. But the annual review that was done on March 2nd of 2015 specifically said Michelson had a positive attitude, despite having endured a very challenging year in 2014, and that he only needs to continue to focus attention on making sure that we're answering all phone calls and returning phone messages within a reasonable amount of time. There was no mandate at that time for 8 a.m. calls. That didn't happen until a week later on March 10th, after Mr. Michelson has been struggling with Tramadol, the effects therefrom, and was missing a lot of work at that time. I'm wondering if you assign significance to the earlier part of the timeline. Mr. Michelson began working for Cummins in September 2011. We don't know if he had any trouble at that point. But then in April of 2014, he began reporting to Mr. Colby. In May, he took unofficial leave. May to October to care for his ailing father. Presumably, he didn't have contact with Mr. Colby during that time, when he was on leave? No, he did, Your Honor. It was more sporadic, because he was trying to just do the bare minimum to keep the activities for his job met. But he was given some leeway, given his family situation. Okay, so unofficial leave doesn't mean leave, leave. Correct. He was working... From home, from Great Falls, in another city. And then on November 11th, there was the conversation I just mentioned. Then he was back. He met with Colby. Colby said, you have to check in every day. And he explained that he'd hurt his shoulder, and there was the worker's comp injury. Correct. So is part of your... I'm not trying to put words in your mouth. I am trying to figure out whether this sequence early on is part of your claim, or if you're only trying to focus our attention on the later events in March. Well, I would like to focus your attention on the later events in March. But the district court focused her attention, I believe, on what Your Honor is referencing the year prior. So that was the reason that I addressed that. And I apologize. I'm out of time. And I didn't get a rebuttal. So... We'll give you two minutes of rebuttal. I sure appreciate that. Thank you. May it please the Court. My name is Jeff Beck, and I represent the Appellee Cummins Incorporated. The crux of this case is whether Mr. Mickelson's failure to follow Cummins's reasonable instruction that he communicate with his supervisor constitutes good cause for termination, or whether it was pretext for a true discriminatory motive. The district court found it did not constitute good cause, or it did constitute good cause, I'm sorry, and that there was no evidence of a discriminatory motive. The case comes down to a simple set of undisputed material facts. Over a 42-day period, Mr. Mickelson spoke to his supervisor one time, and he emailed his supervisor a handful of times, but only either to call in, or to email in, I guess you'd say sick, or to send him a forecast on April 1, and then a couple of times in April about whether he was available to schedule a meeting on a certain date. Other than that, there were no emails, and there was one phone call. This, despite repeated instruction from his supervisor and from Cummins's human resources representative that he needed to communicate with Colby, at least five occasions, the human resources representative, Tara Neenow, specifically told Mr. Mickelson to call his supervisor. She even told him that his failure to do so was insubordination, and would lead to discipline up and including termination if he didn't comply. Ultimately, his communication became so poor that on March 10, his supervisor implemented a brief daily call in so that they could discuss the plans for the day, and so that Mr. Colby knew what Mr. Mickelson's work was, what was going on in the territory. He needed to know these things. Mickelson specifically acknowledged this requirement in that March 10 email. He said, I know that I'm supposed to call you every morning at 8 a.m., and I understand that I'll be disciplined if I don't. That's why he emailed him, so that he wouldn't have to call him on the 11th. These facts aren't disputed, by the way. Communicating with your supervisor is certainly a reasonable job expectation. It's not an onerous requirement. Colby testified he was trying to communicate with Mr. Mickelson so that they could conduct the daily business of the territory, and so that he could make sure that customer needs were being met. Yet, despite all this, Mickelson still didn't communicate with him. The district court found this was good cause for termination. It entered summary judgment on Cummins' behalf, and this court should affirm that decision. I'd like to start briefly with the wrongful discharge case. As we all know, wrongful discharge is wrongful only if it was not for good cause. And that's not a difficult standard to meet in Montana. Good cause is a reasonable job-related grounds for dismissal based on legitimate business reasons, and as long as they are not whimsical, arbitrary, or capricious. The district court found that he was terminated for good cause, that these reasons weren't. Mr. Beck, what about the point that was made by Ms. Proctor that there were no other salesmen for Cummins that were required to check in every morning at 8 a.m.? Well, that's not in the record, but I think even so, I think to look at that, you have to go back to November of 2014. That's when Mr. Colby met with Mr. Mickelson and told him his communication wasn't sufficient and that it needed to improve and he needed to focus on returning his phone calls in a timely manner, including his phone calls. It didn't improve. So in December, he also instructed him again that his failure to return his phone, Mr. Colby's phone calls, was unacceptable. Then we get to March, it didn't improve. So the performance review has a category on there that says communicating with clients, team, and something like that. And he received it, I can have it right here, it actually says responsive to customers, team, and company. He received a needs improvement rating, a 2 on a scale of 4, in that category, in that performance review. And it did say that he needed to focus his attention on making sure he's returning customer calls and my calls in a timely fashion, and emails as well. Forgive me, the date of the performance review is March 2nd? March 2nd, yes. Okay. He got 2.4 out of 4. Yes. But in that category, he got a 2.0, is that right? That's right. Yeah, you either get a 1, a 2, a 3, or a 4, and then they average them all to get the 2.4. Okay. Yes. So he called in, so I think you have to look at it, and I'm sorry this is a long answer, but you have to look at it in that context, that he's the one who's having these communication issues that necessitated this 8am phone call. If he's taking time off because he's injured, or he's going to physical therapy, is he still obligated under Cummins policy to call in? He was obligated under Cummins instruction to call in, that is correct. Even though he's not working because he's injured? That makes it all the more important for him to call in. Because, you know, this arose because the day after the review, he called in. That was March 3rd. Because if he's not working, they could send somebody out there to do his work. That's right. That's right. And he was told that by Taranino. He was reeling from the effects of the tramadol, but he still emailed Colby on the 3rd and asked someone from HR to contact him. Nenow contacted him on the 3rd and told him it was important. And then followed up with an email, said it's important for you to over-communicate with Colby while you're getting treatment for your shoulder injury. She said it's important that Colby can meet the needs of the customers while you get the treatment you need. She stressed to him that it was more important so that they could make sure the customer needs and the territory was being tended to in his absence. Opposing counsel's argument is that if we find there was a legitimate, non-discriminatory reason, that the burden's going to shift and she thinks there was pretext here. Yes. She, she, and she mentioned a few things that she thinks were pretextual. One of them is that he thinks that he was relieved from an obligation to call while treating for the shoulder injury. I think we've discussed that. I'm happy to answer any more questions if you have any on that. The other was that the 8 a.m. check-in requirement singled Mr. Mickelson out. And the other one was Mr. Borland's investigation. Or, I'm sorry, Ms. Borland, the HR representative's investigation. Would you like me to discuss that? I'd like to hear what you have to say about her allegation that, that, that this was pretextual. Okay. Well, to, to be pretextual, it has to... There's this drumbeat in the background. I'll just say, there's this drumbeat in the background because there was this large commission and that, that's in the email traffic. And so, what is your response to this? Yes. There, there, the email, the issue with the large commission, whether that was true or we don't know. But that issue arose because that's what he reported, Mr. Mickelson. That's what he reported when he called the ethics complaint. He said that he was being mistreated by his supervisor. He said that he had a lot, that he thought he was being set up to be terminated. And he said he had a large commission that was coming in on this particular sale. And, and so, of course, what, what Ms. Borland did as the HR representative, who is separate, she was all the way in Memphis, Tennessee, doing this investigation, is that she contacted the HR representative, Nenow, and asked for some background information based on his allegations. She developed questions for her interviews based on the allegations and what she knew from Mickelson's report. And she asked those questions of Mickelson to begin with because she started with him when she conducted this interview. She took, she went with the investigation letter and that letter to ask for documents that were relevant to his, to his charges. So, that does not, absolutely does not evidence pretext in this case. Now, I don't believe there's any evidence of pretext. The case law is clear that mere speculation does not rise to the level of pretext. It has to be something more than that. And I don't think we have that here. Was there any evidence that Cummins terminated other salesmen in order to avoid paying them commissions? No, there's no evidence of that in the record. And I think it's important to, to, to focus on the fact that during the course of this Ninow's, you know, she's contacting him at least five times saying you need to speak to your supervisor and the failure to do that is insubordination and it can result in your termination. And he still didn't do that. Even if you take out the period of time for the investigation, when he gets the notice on April 14th that the investigation is over, well certainly that should, should make him say I need to call my boss on April 15th because I've been told five times that not doing so is insubordination, subject to discipline under Cummins conduct policy. And that conduct policy says for insubordination, it doesn't say you're going to get a performance improvement plan. It says you're going to be subject to immediate discipline up until including termination. Insubordination is a serious offense. And that's what happened in this case. You know, even if you take out all that time, he's still, you have the period before the investigation and the period after. And he didn't comply with the basic instruction that he needed to communicate with the supervisor. What about his claim for disability? Thank you. Yes, his claim for disability discrimination fails for the same reasons. He was terminated. There's no evidence that his, his shoulder injury had anything to do with his termination. He claims there was no reasonable accommodation given him. He's got two claims, right? The disability discrimination and the failure to reasonably accommodate. Those claims both fails for basically the same reason. First of all, you know, he comes to this meeting on November 11th with Colby and he says he hurt his shoulder. He hadn't reported it. Colby said, we're not doing anything tomorrow until you report that injury. Colby's the one who told him to report the injury. He reports the injury. He, he takes time off for therapy. He takes time off when he's ill and he's not disciplined for any of those things. He gets all the time off he needs. His schedule is, you know, they allow his schedule to be flexible. The only thing they wanted him to do was communicate with his boss. And the more flexible they allowed his schedule to be, the more critical it was to communicate with his boss because nobody knew what was going on in the territory. Colby's having to get information third-hand from people at the branch and from, you know, finding out that, oh, so-and-so talked to Ross today and this is what's going on. But he wasn't getting that any information directly from, from Mr. Mickelson. And there's no evidence of pretext with the disability claim. And there's no evidence that he asked for anything and was not in a form of accommodation that he wasn't granted. He did ask for a leave of absence. This occurred, I believe, on the 23rd or 24th or maybe the 18th, I think it was. But Nenow's response was, if you need a leave of absence, there has to be a medical basis for it. Submit the medical basis and we'll, you know, address it. And he never did. The only medical basis he submitted after that was a note saying that he had presented with claustrophobia and he should be, he will be able to come back to work on March 26th. He presented that note on March 24th. That note didn't say anything about the week that he had missed or the time that he had missed after he was released on March 6th. So he's got all this time he's being allowed to take without any medical reason. And so there's absolutely no evidence that Cummins failed to accommodate him. If there's no other questions, we'll rest on the briefs. Thank you, Your Honors. Ms. Proctor, do you want to use some time for rebuttal? Yes, please, Your Honor. And I'll be brief. I think we're getting a little bit down in the weeds, which is what I fear the district court did as well. Because we have to remember that we're at the summary judgment stage here. With whether what Mr. Michelson was doing was reasonable when he was under the influence of opioids with respect to him feeling that Cummins was attacking him or, excuse me, not attacking him, but sort of he actually does make a comment about he feels like the wolf is going after the last one in the herd because he's sick. He's struggling. He's not getting much in the way of accommodation. He kept getting emails from Human Resources gal, Ms. Nino, saying, you're going to be terminated if you don't get us a doctor's note. You're unexcused when he was taking PTO. That was all the way through March. They were, I don't think, they were hostile communications in my opinion. Cummins disagrees. But obviously, that's for the jury to determine whether they had, were accommodating him appropriately or not. Basically, the two factual questions we have in this case that I don't think you can escape is whether the, well, whether Michelson reasonably believed he was excused from making his daily 8 a.m. calls with Mr. Colby when he was sick or otherwise out for medical leave. And number two, whether the investigator, Ms. Borland, advised Mr. Michelson that he could limit his contact with Mr. Colby, i.e. not do the 8 a.m. calls during the pendency of her investigation, which was March 17th through April 14th. Would you repeat that, please? The second point is that the factual dispute is what the investigator said? Correct. Say that again. Sure. Mr. Michelson conveyed his concerns about Mr. Colby to Ms. Borland about making false accusations and he was uncomfortable talking with him because of retaliation concerns. It's disputed about what happened next. But Mr. Michelson is claiming in his sworn affidavit that she told him it was reasonable to not speak with Mr. Colby during the pendency of her investigation. That lasted March 17th through April 14th. Mr. Colby contacted Mr. Michelson April 15th. And I apologize. I'm almost out of time or I am out of time. Keep going. Thank you. He contacted him the day after the investigation ended to come terminate him on the 22nd. The determination for termination had been made by April 15th. So the seven days that they're arguing, well, then he still didn't contact him. He planned to come up on the 22nd and fire him. That was eight days after he found out about the shoulder surgery that Mr. Michelson was to have in early May. So the timeline is hinky as well. I apologize, Your Honor. No, I'm not. On April 15th, there's an email? I believe there is. He contacts Mr. Michelson and asks to have an appointment with him on the 22nd. Okay. Thank you. Thank you very much. Thank you. The case of Michelson v. Cummins is submitted. The court thanks counsel for their argument.
judges: Farris, Bea, Christen